UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                              )
                                                    )    Chapter 11
MYMON REALTY INC.,                                  )
                                                    )    Case No. 10-12488(MG)
                              Debtor.               )
                                                    )
                                                    )
------------------------------------------------------------x
                                                    )
MYMON REALTY INC.,                                  )
                                                    )
                              Plaintiff,            )    Adversary Proceeding
                                                    )    No.
                                                    )
          - against -                               )
                                                    )
COLUMN FINANCIAL, INC.,                             )    **COMPLAINT**
BANK OF AMERICA, N.A., as successor                 )
Trustee for the registered holders of               )
Credit Suisse First Boston Commercial               )
Mortgage Securities Corp., Commercial               )
Mortgage Pass-through, Series 2007                  )
and CSMC-C3 CANAL STREET LLC,                       )
                                                    )
                              Defendants.           )
                                                    )
------------------------------------------------------------x

The plaintiff, Mymon Realty, Inc. ("Mymon"), by its attorneys, Goldberg Weprin Finkel Goldstein LLP, as and for its complaint against the defendants herein, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.  This adversary proceeding seeks to challenge the enforceability of a commercial mortgage loan and related documents originally issued by Column Financial, Inc., and ultimately transferred and assigned to the current mortgage

holder, CSMC-C3 Canal Street LLC. Mymon's challenge is predicated upon predatory and negligent lending practices utilized in originating and making the mortgage loan secured by property at 334 Canal Street, New York, NY 10013 (the "Building").

2. The Building lacked a residential certificate of occupancy and an automatic sprinkler system at the time of closing. As a result, the Building could not be lawfully leased and occupied for residential purposes due to its classification under New York law as a multiple dwelling.

3. Thus, from the outset, Mymon's ability and authority to collect rents was seriously compromised. In reality, Column Financial should not have made and issued the mortgage in question.

## THE PARTIES

4. Mymon is a domestic corporation organized and existing under and by virtue of the laws of the State of New York with its principal offices at 334 Canal Street, New York, New York 10013.

5. Mymon filed a voluntary petition under Chapter 11 of the United States Code on May 7, 2010 and thereafter has continued in possession and management of its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

6. Upon information and belief, the defendant Column Financial, Inc. ("Column Financial") is and was at all times mentioned herein a domestic

corporation organized and existing under and by virtue of the laws of the State of Georgia, with offices at 11 Madison Avenue, New York, New York 10010.

7.  Upon information and belief, defendant, Bank of America, N.A. ("Bank of America"), is and was at all times mentioned herein a domestic corporation organized and existing under and by virtue of the laws of the State of North Carolina with its principal offices at 1000 North Tryon Street, Charlotte, North Carolina 28202.

8.  Upon information and belief, the defendant, CSMC-C3 Canal Street ("CSMC"), is a Delaware limited liability company, with offices c/o LNR Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33131.

## JURISDICTION

9.  The Bankruptcy Court has jurisdiction over this adversary proceeding as a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B), (C), (K) and (O) in that this adversary proceeding concerns the administration of Mymon's Chapter 11 case; affects allowance of the alleged secured claim held by CSMC; constitutes a potential counterclaim by Mymon to CSMC's claim in bankruptcy; requests a determination as to the extent and validity of CSMC's alleged mortgage lien; and otherwise involves adjustment of debtor-creditor relationships.

## BACKGROUND FACTS

10. In late 2006 or early 2007, MM Canal Realty, Inc. ("MM") approached Mymon's principal, Oded Adri, and offered him the opportunity to purchase the Building for $11 million.

11. The Building itself was constructed in 1910 and today contains five floors. The second, third, fourth and fifth floors were occupied for residential use and contain five (5) relatively large apartment units.

12. The basement and first floor of the Building are used as commercial space and occupied by a retail tenant Canal Street Music Audio Inc., doing business as Uncle Steve's Car Stereo pursuant to lease dated May 1, 2007 (the "Commercial Lease"). Canal Street Music Audio, Inc. is owned by the son of the Debtor's principal.

13. On information and belief, at the time that MM offered Mymon the Building for sale, it was fully occupied and rented with a substantial portion of the total rents being generated from the residential apartments.

14. In order to finance the acquisition, Mymon obtained purchase money financing from Column Financial, a subsidiary of the Credit Suisse Group.

15. Mymon selected Column Financial based upon assurances that Column Financial was experienced in making commercial real estate loans and had conducted requisite due diligence regarding the Building, including the legality of the tenant mix, occupancy and rent structure.

16. Prior to the closing of the sale transaction, Mymon was provided an appraisal (the "Original Appraisal") that was ordered by Column Financial and prepared by Leitner Group, Inc. (the "Leitner Group").

17. The Original Appraisal noted that it was legally permissible for the Building to be occupied by residential tenants. Original Appraisal at 74-75. The Original Appraisal did not note that the Building lacked a certificate of occupancy or that the presence of a certificate of occupancy that conformed to the Building's use was necessary for the Building to operate or sustain its projected value.

18. The Original Appraisal was one of several communications in which Column Financial indicated to Mymon a substantial value for the Building, but failed to disclose any infirmities or harm to the value of the Building arising from the lack of a residential certificate of occupancy.

19. In light of Column Financial's experience, expertise and assurances that it would engage in due diligence that would have the practical effect of protecting the interests of both lender and borrower, Mymon reasonably relied upon the Original Appraisal and all other statements made by Column Financial and its agents while assessing whether to purchase the Building and close on the mortgage.

20. If Column Financial had disclosed all of the negative repercussions surrounding the lack of a residential certificate of occupancy to the Building, Mymon would have not purchased the Building, nor executed the mortgage and

related loan agreements and would not have suffered the damages complained of herein.

21. Notably, the appraisal (the "New Appraisal") recently commissioned by CSMC (attached as Exhibit A to the Motion of CSMC for Dismissal, or in the Alternative, for Relief from the Automatic Stay [Doc. No. 8]), notes the substantial negative impact of the absence of a residential certificate of occupancy on the Building and suggests that, without a proper certificate of occupancy, the Building's value may be substantially lower than the now estimated $7.1 million.

22. The New Appraisal further states that the Building "contains illegal residential uses on the upper floors that are inconsistent with the Certificate of Occupancy" and suggests that it is beyond the Leitner Group's expertise to value buildings that are illegally used and "that a buyer would require a discount to the market value." New Appraisal at 3, 84.

23. Given that such disclosures were provided in the New Appraisal, Column Financial and its successors, including the other Defendants, were at minimum negligent, if not actually engaged in bad faith and other wrongdoing, in failing to disclose the impact of the absence of a certificate of occupancy in presenting the Original Appraisal to Mymon.

24. The sale transaction itself closed on or about May 16, 2007 (the "Closing Date") at which time Column Financial issued a $9.5 million mortgage loan (the "Mortgage"). The Mortgage was memorialized by numerous agreements, including, and not limited to, a certain Mortgage, an Amended,

Restated and Consolidated Mortgage and Security Agreement (the "Mortgage and Security Agreement"), an Amended, Restated and Consolidated Promissory Note (the "Note"), an Operations and Maintenance Agreement, an Assignment of Leases and Rents, an Indemnity and Guaranty Agreement, and an Hazardous Substances Indemnity Agreement (together with all other agreements the "Loan Agreements").

25. The Note ran for a ten-year term maturing on June 11, 2017 with interest at 5.7% per annum. This equated to a monthly debt service payment of approximately $55,138.04, excluding taxes (the "Mortgage Payment").

26. In order to service each Mortgage Payment, it was incumbent that the Mymon generate rental income from the Building's residential apartments. Without residential rental income, the Mortgage was doomed to failure and, upon information and belief, Column Financial underwrote and structured the Mortgage based upon continued and uninterrupted receipt of residential rents.

27. Mymon invested more than $2.0 million to purchase the Building and consummate the Mortgage, including a downpayment of $1.5 million, approximately $500,000 in closing costs and taxes, and $165,600 in deposits to reserve accounts, including the Capital Reserve (described below).

## ISSUES SURROUNDING THE CERTIFICATE OF OCCUPANCY

28. At the time of closing, the Building lacked (and despite Mymon's best efforts, continues to lack) a residential certificate of occupancy for the Building's residential apartments.

29. On information and belief, in order to procure a Certificate of Occupancy, Mymon must, among other things, install an automatic sprinkler system and correct numerous other violations.

30. The lack of a residential certificate of occupancy poses a threat to the viability of the Building since, as known or should have been known to Column Financial and its successors, the renting of the residential units in the Building was as of the Closing Date and continues to constitute a violation of the New York City Administrative Code and New York State laws.

31. Mymon was not initially aware of the full legal consequences and ramifications of operating without a residential certificate of occupancy based upon Column Financial's contrary assurances. Additionally, Mymon's prior real estate and closing attorney never informed Mymon or Mr. Adri of the illegality of the contemplated use of the Building as then constituted.[1]

32. On information and belief, the attorney failed to provide Mymon with full and complete disclosure because of, among other reasons, a conflict of interest resulting from the relationship between (1) the attorney, (2) Column Financial, and (3) Groothius & Company, Inc., which served as Column Financial and Mymon's mortgage broker.

---

[1] Mr. Adri has brought a malpractice action against his former attorney in connection with the deficiencies in his counsel in connection with Mr. Adri's equity investment into Mymon. Adri v. Benimowitz, Case No. 10106390/10 (N.Y. Sup. Ct. New York Cty. May 14, 2010). Mymon's time to assert similar claims is extended pursuant to 11 U.S.C. §108(a).

33. At no time did Column Financial or its successors, ever inform Mymon of the illegality or unlawful of the contemplated renting of the Building without a residential certificate of occupancy and automatic sprinkler system.

34. Instead, as a condition to closing the Mortgage, Mymon was required to deposit $165,600 in a reserve account at closing that could be drawn upon for capital expenditures necessary to procure the residential certificate of occupancy (the "Capital Reserve").

35. The Capital Reserve was established to attempt to facilitate receipt of a residential certificate of occupancy, but Column Financial knew, or should have known, or was negligent in not knowing, that this was not a legal, correct or proper solution. Ultimately, the Capital Reserve proved ineffective.

36. Contemporaneously with the establishment of the Cap-Ex Reserve Account, Mymon hired CBA Architects & Consultants ("CBA") to bring the Building into full compliance with all laws, ordinances, rules, and regulations. The hiring was approved of by Column Financial. CBA was paid a total sum of approximately $10,400. Mymon was not reimbursed for these expenses from the Capital Reserve or any of the other reserve accounts established in connection with the Mortgage.

37. On information and belief, CBA is no longer in business. CBA has not repaid any sums it received on account of its hiring nor provided Mymon with a copy of the plans necessary to obtain a residential certificate of occupancy.

Mymon has taken efforts to locate CBA, but those efforts failed, leaving the status of the residential certificate of occupancy greatly in doubt.

38. After Mymon retained new counsel in the early fall of 2009, Mymon learned of the health, safety, welfare and legal consequences and ramifications of operating the Building without a residential certificate of occupancy. In September 2009, Mymon requested that all existing residential tenants leave the Building because their safety could not be assured.

39. Instead, relying upon, among other things, New York Multiple Dwelling Law § 302(1)(b) (which provides that if a building lacks a residential Certificate of Occupancy and needs one, "no rent shall be recovered by the owner of such premises for said period, and no action or proceeding shall be maintained therefore, or for possession of said premises for nonpayment of such rent."), residential tenants have squatted in the Building and have refused to pay rent. As of this date, two (2) of the residential apartments remain occupied by squatting tenants. Furthermore, Mymon is prevented from obtaining new tenants for vacant apartments.

40. Due to the Building's residential tenants' refusal to pay rents, and Mymon's inability to rent out the vacant residential apartments without a residential certificate of occupancy, Mymon was unable to stay current on its Mortgage obligations. On September 21, 2009, Wachovia Bank, N.A., the then-servicer of Mymon's mortgage, called a payment default.

41. Despite Mymon's interest in engaging CSMC in discussions about restructuring and improving the Building, on February 23, 2010, CSMC filed a verified complaint against Mymon seeking to foreclose on the Building. On April 5, 2010, the Honorable Carol E. Huff of the New York State Supreme Court, New York County entered an order appointing Carol Lilienfeld as a receiver. On May 7, 2010, Mymon filed for bankruptcy protection in order to reorganize its business and restructure its liabilities.

42. All of this could have been avoided had Column Financial and its successors exercised sound lending practices.

### AS AND FOR A FIRST CLAIM FOR RELIEF DECLARING THE MORTGAGE, NOTE, LOAN AGREEMENTS UNENFORCEABLE AND/OR SUBJECT TO REDUCTION AND ABATEMENT

43. Mymon repeats and realleges each and every allegation contained in paragraphs 1 through 42 as if the same were more fully set forth herein.

44. At all relevant times, Column Financial and its successors knew that the Building lacked a residential certificate of occupancy and automatic sprinkler system which severely compromised Mymon's ability to collect rents and, in turn, undermined Mymon's ability to satisfy the obligations due in connection with the Mortgage.

45. Column Financial made and issued a mortgage loan that violated multiple provisions of the New York City Administrative Code, including §§ 27-2115 and 27-2118 which imposes penalties for failure to comply with the Building

Code, including requirement that the Building have an automatic sprinkler system as mandated by Administrative Code § 27-954.

46. New York City Administrative Code § 28-118.1 states "[n]o building or open lot shall be used or occupied without a certificate of occupancy issued by the commissioner [of buildings]." Thus, as a result of the lack of a residential certificate of occupancy, and as a matter of law, the Building's could not be fully leased.

47. New York State law is also offended by the issuance of the Mortgage without a residential certificate of occupancy. Specifically, New York State Multiple Dwelling Law § 301(1) provides that a building may not be occupied in whole or in part until the locality has issued a certificate that the building complies with the requirements of the New York Multiple Dwelling Law, the building code and rules, and all other requirements of applicable law.

48. In short, both New York State and New York City laws were violated when Column Financial issued the Mortgage to finance the purchase of the Building that lacked a residential certificate of occupancy and an automatic sprinkler system and was affected by other violations, knowing that residential tenants would continue to reside there and Mortgage Payments could not be made without receipt of residential rents.

49. In view of the foregoing, Mymon is entitled to a judgment against all of the Defendants, including the current mortgagee, CSMC, finding and declaring that the Mortgage and all other Loan Agreements are rendered unenforceable

and/or subject to reduction and abatement by reason of the making and underwriting of a loan dependent on collection of rents from residential tenants in a building that lacks a residential certificate of occupancy.

### AS AND FOR A SECOND CAUSE OF ACTION CANCELLING AND SUSPENDING PAYMENTS ON ACCCOUNT OF THE NOTE

50. Mymon repeats and realleges each and every allegation contained in paragraphs 1 through 49 as if the same were more fully set forth herein.

51. New York Multiple Dwelling Law § 302(1)(b) notes that if a building lacks a certificate of occupancy and needs one, "no rent shall be recovered by the owner of such premises for said period, and no action or proceeding shall be maintained therefore, or for possession of said premises for nonpayment of such rent."

52. Additionally, even if a building only lacks a residential certificate of occupancy, a commercial tenant need not provide rent payments while the entire building is not certified.

53. The Building must have a certificate of occupancy and an automatic sprinkler system for its complete use and occupancy. Accordingly, under these circumstances, to require Mymon to make payments under the Mortgage when it has no current legal entitlement to collect rents would be inequitable and should not be countenanced by this Court, as a court of equity.

13

54. In view of the foregoing, Mymon is entitled to a judgment relieving it from the obligation to make any payments under the Mortgage to the current holder CSMC, retroactive to the closing on the Mortgage in 2007.

### AS AND FOR A THIRD CLAIM FOR RELIEF FOR UNJUST ENRICHMENT

55. Mymon repeats and realleges each and every allegation contained in paragraphs 1 through 54 as if the same were more fully set forth herein.

56. Having issued the Mortgage without a proper certificate of occupancy and automatic sprinkler system, and thereafter having received payments of principal, interest and other fees and expenses since the closing in 2007, Column Financial and/or its successors have been unjustly enriched at Mymon's expense.

57. As a result of the foregoing, Mymon is entitled to a judgement requiring that Column Financial and the other Defendants disgorge any and all payments received from Mymon in connection with the Mortgage including Mortgage Payments, the Capital Reserve, fees, expenses and other costs.

### AS AND FOR A FIFTH CLAIN FOR FRAUDULENT CONCEALMENT AND/OR NEGLIGENT ADMINISTRATION

58. Mymon repeats and realleges each and every allegation contained in paragraphs 1 through 57 as if the same were more fully set forth herein.

59. ,At all times relevant hereto, Column Financial made numerous representations that: (i) the Mortgage, Note and other Loan Agreements constituted immediately legal and lawful obligations; and (ii) the continued

occupancy of the residential units did not violate any state or city laws irrespective of the lack of a residential certificate of occupancy.

60. Column Financial and its successors knew, or should have known, that these representations were false and untrue, or alternatively that they were made negligently and recklessly.

61. On information and knowledge, Column Financial and/or its successors were aware of the numerous adverse consequences of issuing the Mortgage without a proper certificate of occupancy and automatic sprinkler system.

62. However, Column Financial and/or its successors failed to disclose such consequences to Mymon in a deliberate and calculated effort to wrongly induce Mymon to enter into the Mortgage and continue to make Mortgage Payments.

63. By executing and servicing the Mortgage, Column Financial was able to earn closing and servicing fees and principal and interest payments and then quickly sell the Mortgage at an attractive price as part of a securitization.

64. These actions were calculated to ensure that Column Financial would profit in the short-term and avoid long-term liability in spite of its issuance of an otherwise unsound debt obligation.

65. In view of the foregoing, Mymon has been damaged by Column Financial's and its successors' fraudulent concealment, misrepresentations and/or negligent administration and is entitled to a judgment against each of the

Defendants recouping all amounts paid in connection with the Mortgage, plus deeming the Mortgage and Note, and other Loan Agreements subject to rescission.

WHEREFORE, Mymon prays for relief against the defendants herein consistent with all of the foregoing, together with such other and further relief as is just and proper.

Dated: New York, New York
June 7, 2010

Goldberg Weprin Finkel Goldstein LLP
Attorneys for Mymon
1511 Broadway, 22nd Floor
New York, New York 10036
Telephone: (212) 221-5700

By: _____
Kevin J. Nash, Esq.
A Member of the Firm

H:\sylvia\word\Mymon Realty Inc. - (bankruptcy) MYMON.29040\Mymon Realty v. Column Financial, etc\Draft Complaint 6-7-10 Final.doc

16